Fawcett v. Powell.

---

JACOB FAWCETT, APPELLANT, V. D. A. POWELL ET AL., APPELLEES.

FILED JANUARY 5, 1895.    No. 5712.

1. Negotiable Instruments: FRAUD: BURDEN OF PROOF. In an action by an indorsee of a promissory note against the maker, where the defendant pleads fraud in the inception of the note, the burden is upon the plaintiff to show that he is a *bona fide* holder for value. Following *Violet v. Rose*, 39 Neb., 660.

2. ———: ———: ———. The appellant's failure to make the proof required, under the circumstances above indicated, necessitates an affirmance of the decree entered by the district court.

APPEAL from the district court of Douglas county. Heard below before DAVIS, J.

*Fawcett, Churchill & Sturdevant,* for appellant.

*Brome, Andrews & Sheean,* contra.

No briefs filed.

RYAN, C.

This was a foreclosure proceeding begun in the district court of Douglas county by appellant against D. A. Powell and Mary L. Powell on their real estate mortgage made to Frank H. Kingman. The notes secured by the mortgage, for the foreclosure of which this action was commenced, were transferred by Kingman to Frank Barnard and C. L. Blazer, through whom appellant Fawcett claimed title. Fawcett made each preceding holder of these notes held by him a defendant. The defendants, D. A. and Mary L. Powell, answered, denying that Fawcett was a holder of any notes as a purchaser, or for value, and setting up that Blazer, by falsely representing the value of the stock of the Don Carlos Lumber Company, had induced D. A. Powell to purchase of this stock $10,000 in stock at its par value, in payment for which D. A. Powell gave his notes, amounting to $10,000, to Kingman, by whom they were fraudulently transferred to Barnard and Blazer, through whom Fawcett, with knowledge of the character and history of said notes, derived his title thereto. Two banks were made parties plaintiff by intervention on their own application, and thereupon they alleged that they had taken as collateral security to loans made to Fawcett some of the notes of Powell, secured by the aforesaid mortgage. In favor

of these banks, as well as in favor of two individuals who, by intervention, asked the foreclosure of an independent mortgage on the same property as that in respect to which Fawcett claimed the right to foreclosure, the relief prayed was granted.   There now remains but one party complaining, and that party is appellant Fawcett, who, in argument on his own behalf, says that the sole question to be determined is whether or not under the evidence he was an innocent purchaser of the paper in controversy.   The defense pleaded was fully substantiated by the evidence as against the original payee of Powell's notes.   It was shown by the proof that the firm of Fawcett & Davis, of which appellant was a member, leased three adjoining rooms and sublet one of these rooms to the Don Carlos Lumber Company, and that during the time in which the transactions complained of transpired Mr. Davis, of the firm of attorneys aforesaid, was president of the Don Carlos Lumber Company, and its legal adviser.   The firm of Fawcett & Davis sub-leased a room to the lumber company for the convenience of Mr. Davis, as its president, and because the firm of Fawcett & Davis expected that the fees to be earned by that firm as attorneys at law would compensate for the inconvenience of yielding up the possession of one room.   Mr. Fawcett had been succeeded as cashier by Mr. Barnard, and had sold to him his stock in the Mechanics & Traders National Bank of Omaha.   Mr. Fawcett's description of his purchase of the notes in respect to which he sought the foreclosure of the mortgage made by Powell was as follows:

"Mr. Barnard, who at that time was vice president of the Mechanics & Traders Bank and had been a client of mine, came to me and said he wanted to raise $5,000, and brought these notes and that mortgage and wanted to know if I could sell them for him.   I had once before sold $4,500 worth of the paper for him to Mr. Hopkins, secured by mortgage or deed of trust on this Missouri property, and he had taken up the notes and paid them.

I took this paper to Mr. Hopkins first. Mr. Hopkins said he didn't care to buy it. I then offered the paper to John L. McCague. Mr. McCague said that it was a larger amount than he wanted to buy. I then went back to the office, and some time during the day Mr. Barnard came in and I told him I had been unable to sell the paper to either Mr. Hopkins or Mr. McCague, and I didn't know of any one else to deal with; but he said he wanted $5,000 very badly and wanted it that day, and he went out of the room and came in with Mr. Blazer. He was alone at the time I spoke. He came in and said, 'You cut the paper in two, take $5,000 for it,' and Mr. Barnard said he would indorse the whole paper. I asked him how he could afford to do that if he was only getting half the money, He said half the money would go to him. He said he had an arrangement with Blazer by which he would be secured for the other half, and he knew where it was coming from all right and that he would cut the paper in two. I told him if he would give me $5,000 stock of the Mechanics & Traders National Bank as collateral I would take it. He said he would and did so, and I went right over to the Commercial National Bank. * * * I showed Mr. Millard the papers which I had, which were two of these notes and the $5,000 of the Mechanics & Traders Bank stock and asked him if he would loan me $5,000 on that collateral. He said he would, and I gave him my note for $5,000 and deposited two of these notes and the $5,000 in stock as collateral security, and I deposited the $5,000 in the Mechanics & Traders Bank to the credit of Barnard."

The bank for which Mr. Millard was acting was protected by the decree of the district court as the *bona fide* holder of the notes pledged to it as collateral security. We have been unable to discover in the entire transaction as described by Mr. Fawcett the least indication that he purchased any notes in the sense in which the term "pur-

German-American Ins. Co. v. Hart.

chased" is ordinarily used or accepted. It is highly prob-
able that by raising the sum of $5,000 for Mr. Barnard by
pledging notes to the same amount as well as other collat-
eral security furnished by Mr. Barnard himself, the other
notes to the amount of $5,000 became the property of Mr.
Fawcett. This, however, was in no sense such a purchase
as might be described as in the ordinary course of busi-
ness. The defense of fraud in the inception of the notes
held by Mr. Fawcett was established without question—
indeed the perpetrators of the fraud for some reason failed
to testify. The rule which governs the right of a holder
of a note under these circumstances is thus stated in *Violet
v. Rose*, 39 Neb., 660: "It seems that in an action by an
endorsee of a promissory note against the holder, where
the defendant pleads fraud in the inception of the note,
the burden is upon the plaintiff to show that he is a *bona
fide* holder for value." Mr. Fawcett failed to do this, and
the judgment of the district court is

                                          AFFIRMED.